2025 IL App (2d) 250293-U
No. 2-25-0293
Order filed September 29, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 25-CF-1026 |
| TRAVIS D. BLAIR, | ) ) ) | Honorable Bianca Camargo David Paul Kliment, |
| Defendant-Appellant. | ) | Judges, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*: Trial court's detention orders affirmed, where defendant, who was on probation for aggravated discharge of a weapon, allegedly shot at a stranger who asked him a routine question.

¶ 2    Defendant, Travis D. Blair, appeals from trial court orders granting the State's petition to deny him pretrial release pursuant to article 110 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/art. 110 (West 2024)), as amended by Public Acts 101-652, § 10-255 (eff. Jan. 1,

2023) and 102-1104, § 70 (eff. Jan. 1, 2023).[1] Defendant argues that the State failed to meet its burden of proving by clear and convincing evidence that: (1) he poses a real and present threat to the safety of any person or persons or the community based on the specific, articulable facts of the case and (2) no condition or combination of conditions can mitigate the real and present threat to the safety of any person or persons or the community based on the specific, articulable facts of the case. We affirm.

¶ 3                                  I. BACKGROUND

¶ 4      On May 10, 2025, defendant was charged with aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2024)) and unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)).

¶ 5                              A. Detention Hearing

¶ 6      On May 10, 2025, the State petitioned to deny defendant pretrial release, arguing that defendant had been charged with aggravated discharge of a firearm and unlawful possession of a weapon by a felon, he was charged with a forcible felony and his pretrial release posed a real and present threat to the safety of any person or the community, and his criminal history consisted of a disorderly conduct conviction, a plea of guilty to aggravated discharge of a firearm for which he was still on probation, and driving under the influence (DUI) for which he was on court supervision. The State also noted that defendant had a pending case for obstructing a peace officer (case No. 25-CM-16). A public safety assessment report rated defendant at five out of six on a new-criminal-activity scale and three out of six on a failure-to-appear scale.

---

[1]Public Act 101-652 (eff. Jan. 1, 2023), which amended article 110 of the Code, has been referred to as the "Pretrial Fairness Act" and the "Safety, Accountability, Fairness, and Equity-Today (SAFE-T) Act." However, neither title is official. *Rowe v. Raoul*, 2023 IL 129248, ¶ 4 n.1.

¶ 7    On May 11, 2025, at a hearing on the State's petition, which was before Judge Bianca Camargo, police synopses in several cases were admitted into evidence and related as follows. The synopsis in the present case related that, on May 9, 2025, at 4 p.m., Aurora police Officers Buehler and Garcia responded to the area of Spruce Street and North Locust Street after a call for shots fired. Residents stated that they heard four shots and observed a white four-door sedan chasing a male and firing shots at him before fleeing the scene. Subsequently, victim Joshua E. Anderson arrived and stated that defendant and co-defendant Jaron D. Rayford engaged in an unprovoked physical fight with him at the Shell gas station at 320 West Galena Boulevard and flashed a firearm at the victim. Afterward, defendant followed the victim in his vehicle, a white Ford Fusion (license plate No. CG96806). At the intersection of Spruce and Locust, defendant again produced a firearm and fired one shot in the victim's direction. Three fired shell casings were found in the area where the victim alleged that defendant fired "shots" at him. Further, two live 9-mm rounds were found in defendant's car that matched the fired casings found on the scene. Witness Jacob T. Brown stated that he was in the back passenger seat of defendant's vehicle with defendant driving when defendant fired what he believed was a " 'BB Gun' " at the victim. Security camera footage from the gas station showed defendant and co-defendant arriving at the station and wearing clothing matching that described by the victim. The footage also showed defendant and co-defendant engaging in a physical fight with the victim and defendant reaching toward his waistband while facing away from the camera and facing the victim. Defendant and co-defendant then re-entered the vehicle after the victim left the station; they exited the station in the victim's direction. Defendant's vehicle was subsequently located in the Northgate Shopping Center parking lot; defendant and co-defendant stood by the vehicle and were taken into custody. The victim was brought to the scene for a "show up" and identified defendant and co-defendant as

the two individuals who fought with him and shot at him. During an interview, defendant neither confirmed nor denied that he was at the gas station, but co-defendant stated that he was at the station and involved in a fight with defendant.

¶ 8    The synopsis in co-defendant's, Jaron D. Rayford's, case (No. 25-CF-1027) related that, on May 9, 2025, at 4:02 p.m., officer Garcia responded to a shots fired call at Spruce Street and North Locust Street. Anderson relayed that, at the Shell gas station, he approached a group of males surrounding a white Ford sedan and asked for a cigarette. Defendant yelled at Anderson, and co-defendant Rayford approached Anderson and struck him. Anderson defended himself, and the fight ended. Anderson began to walk away, and defendant flashed at him a black handgun that was in his waistband. Anderson then walked north on Locust toward Spruce Street and observed the white Ford following him. The Ford pulled over, and defendant pointed a firearm out of the vehicle and fired one round in his direction. Anderson fled westbound on Spruce, and the vehicle turned around and followed him. The vehicle then stopped, and co-defendant Rayford exited the vehicle and fired multiple rounds at Anderson, who fled. The vehicle left the area. Anderson told police that he did not know the individuals. Three spent shell casings were found in front of 367 Spruce Street where co-defendant fired multiple rounds. Security video confirmed the fight, where co-defendant was observed approaching and striking Anderson, who, in turn, defended himself. The fight ended, and Anderson left. The Ford was later located, along with defendant, co-defendant, and witness Jacob Brown. In the vehicle, police found on the floor board two live rounds. During a show up, Anderson identified defendant and co-defendant as the individuals who shot at him. They wore the same clothing as in the security footage. During interviews, co-defendant stated that he was at the gas station with defendant and Brown and that defendant had gotten into an altercation with Anderson; co-defendant intervened and was battered by Anderson.

Defendant neither confirmed nor denied he was at the gas station or had anything to do with the incident. Brown confirmed that he, defendant, and co-defendant were at the gas station and that a fight had occurred with Anderson. After the fight, defendant (the driver, with co-defendant in the front passenger seat and Brown in the back), followed Anderson. Brown stated that defendant pulled over and shot once at Anderson. He also stated that defendant was the only shooter. Co-defendant is a documented member of the Gangster Disciples.

¶ 9    In the police synopsis in case No. 19-CF-1285, police noted that a charge was authorized against defendant for aggravated discharge of a firearm – occupied building. On June 28, 2019, shortly after midnight, police responded to a shots fired call at an apartment building in Aurora. En route, police learned that a witness observed an African American male later identified as defendant discharge a handgun in the hallway after exiting apartment No. 316. At the scene, police recovered four spent shell casings in the hallway and observed damage to the drywall that was consistent with a bullet hole. The female occupant of apartment No. 316 related that she was visiting her friend Curtis and that defendant, whom she knew as "Twist," was also there. Defendant and Curtis consumed a lot of alcohol that evening. At one point, defendant sat, and a handgun fell out of his pants. He stated, "you didn't see nothing." The men began acting strangely, and the woman asked if they were gay. Defendant became angry and pointed the gun at her face. Curtis told defendant to stop and ordered him to leave. Defendant pointed the gun at both Curtis and the woman and pushed Curtis into a wall. Defendant then exited the apartment. The woman heard gunshots in the hallway. Several neighbors later reported that they heard gunshots in the hallway, and one neighbor observed through a peep hole an African American male with dreadlocks walking backwards from apartment No. 316. He was pointing his arms toward the apartment, consistent with having a handgun. When he turned, the neighbor observed what

appeared to be a black handgun in the male's hands. As the male walked away from the apartment, the neighbor heard three to four gunshots. A police search of the nickname Twist and Lil Twist identified the monikers as those for defendant. Later, police responded to a dispatch for a suspicious person at 1711 Gary Avenue and located defendant laying the backyard of 1761 Gary Avenue wearing the same clothing as described by the woman in the apartment. He was taken into custody, and the woman identified defendant as the person who discharged the handgun.

¶ 10 Defendant was later interviewed and stated that he was at the apartment and was robbed by two unknown males in the hallway. They beat him on the head and took his belongings (cash, car keys, phone, and necklace). The synopsis further related that it was obvious that defendant was not being truthful and changed his statement. He also had in his property a phone, car keys, and cash. He refused to provide a description of his vehicle and did not have any visible injuries. The car keys had a tag for a 2002 Lincoln Continental. The car was located in the apartment's parking lot, and a loaded .40-caliber Glock handgun with an extended high-capacity magazine was located on the opposite side of a fence next to the driver's side of the car.

¶ 11 The synopsis in case No. 25-CM-16 stated that charges were authorized against defendant for obstructing a peace officer. On January 4, 2025, around midnight, Aurora police officers responded to a disturbance/possible stabbing at 430 North River Street, Unit 415. When they entered the building, police located three males in the stairwell/hallway of the complex. The males began to walk away from the officers. Officer Rolfes yelled out "Police, Stop!" All three continued to run out of the rear of the building. Officer King grabbed defendant and took him into custody after a brief foot pursuit. The original caller and an independent witness told police that, on January 4, 2025, they heard a physical altercation from apartment No. 415. When the witness stepped into the hallway, she observed three males and two females arguing. One of the males

appeared to be bleeding from the head. The witness knew that defendant was dating Brianna Smith, who was the leaseholder for the apartment. Smith denied that anything physical occurred in her apartment complex. Police observed that Smith had a black eye that appeared old and fresh scrape marks on her left arm. She became uncooperative. This was the second call for service in one hour to which the police responded at apartment No. 415 for someone possibly being stabbed.

¶ 12    At the hearing on the State's petition, the State argued that the police synopsis in this case, including Anderson's and other witnesses' statements, were corroborated by the gas station video and the shell casings that were discovered and supported a finding that defendant committed the charged offenses. Also, the passenger/witness placed defendant in the vehicle. The victim also stated that he was shot at by both defendant and by the co-defendant. Further, the State argued that it had established, based on the same evidence, that defendant posed a real and present threat to Anderson's and the community's safety. Next, addressing defendant's criminal history, the State referenced the other synopses admitted into evidence and further noted that defendant's history included the same crime—aggravated discharge of a firearm. Here, defendant was a convicted felon, was on probation, and possessed a firearm and shot it toward another person. Thus, he posed a real and present threat, and no conditions would mitigate the threat defendant posed. Electronic home monitoring (EHM), a no-contact order, a stay-away order, etc., would not, the State asserted, be sufficient to stop defendant because they do not monitor whether he possesses a firearm. He also has the ability to occasionally leave his residence while on EHM. Further, EHM does not limit others from coming into contact with defendant.

¶ 13    Defense counsel responded that the State had not met its burden to show defendant committed the charged offenses, where no gunshot-residue test was done on defendant, no gun was found on him or in the vehicle, and the synopses' provide contradictory recollections of the

shell casings, with one relating that defendant allegedly fired one shot but three casings were located near where he allegedly fired shots (and none where co-defendant allegedly fired shots) and the other relating that no casings were located where defendant allegedly fired shots and multiple casing were located where co-defendant allegedly fired shots. Addressing defendant's criminal history, counsel argued that his prior aggravated-discharge conviction occurred six years earlier and that defendant was placed on probation for four years; his probation violation was based on not completing a drug and alcohol evaluation and treatment, not due to additional offenses. He had a DUI in 2023, but that is not a violent offense, counsel noted, and he was offered court supervision despite being on probation. Defendant's obstructing-a-peace-officer charge was not a violent offense, counsel further noted. Thus, counsel argued, defendant did not pose a threat to any person. Also, defendant does not know Anderson or have reason to seek him out. Counsel further noted that defendant would be able to pay for EHM and requested that defendant be released on conditions to not have any contact with Anderson and to be placed on EHM. Counsel also noted that defendant has two five-month-old sons and he watches them while his wife is at work. He also takes care of his grandmother and his mother, and he lives with his mother.

¶ 14    The trial court granted the State's petition, finding that the State had met its burden to establish that defendant committed a qualifying offense. The court relied on the admitted exhibits, including the witness statements, the video corroboration, and the recovered shell casings. As to dangerousness, the court found that the synopses in this case and co-defendant's case reflected that a routine question by Anderson escalated into the incident at issue and supported a finding that defendant posed a threat to Anderson and to Brown (based on his statements to police). The court also relied on defendant's criminal history. Finally, as to whether any conditions could mitigate the threat defendant posed, the court noted that defendant was on probation for aggravated

discharge of a firearm when he was charged with the present offenses. He was also on supervision for a DUI. The court found that defendant would not be able to follow conditions of any court orders. He is also a convicted felon who should not possess a firearm. The allegations in this case showed, the court found, that defendant cannot follow the law and would not follow conditions, such as EHM or GPS.

¶ 15                                B. Motion for Relief

¶ 16    On June 24, 2025, defendant filed a motion for relief. See Ill. S. Ct. R. 604(h)(2) (eff. Apr. 15, 2024). Defendant disputed the court's findings that the State met its burden to prove by clear and convincing evidence that: (1) the proof is evident or the presumption great that he committed the offenses charged, where the police synopses upon which the court relied were based on the lower probable-cause standard; (2) he posed a real and present threat to the safety of any person or persons or the community, where defendant's pending obstruction charge is a nonviolent misdemeanor charge; and (3) no conditions could mitigate any alleged threat, where defendant had offered that he could be placed on EHM and under no contact order. At the hearing on defendant's motion, which was before Judge David Paul Kliment, counsel argued that defendant could be placed on conditions such as EHM or GPS, he was working at the time of his arrest, and he has ties to the community. Also, there is no connection between him and the victim, and the court could order that defendant have no contact with him.

¶ 17    The trial court denied defendant's motion, finding that the exhibits, particularly the police synopsis in this case, showed that the State met its burden to show that the proof is evident and presumption great that defendant committed aggravated discharge of a firearm and that there are no less restrictive conditions available to protect the public and the witnesses from defendant. The

court also noted that the shooting was seemingly random and for no apparent reason. Defendant was also on probation for the same offense.

¶ 18    On July 14, 2025, defendant filed a notice of appeal. The court appointed the Office of the State Appellate Defender (OSAD) to represent defendant (Ill. S. Ct. R. 604(h)(3) (eff. Apr. 15, 2024), and OSAD elected to file a notice in lieu of a memorandum under Illinois Supreme Court Rule 604(h)(7) (eff. Apr. 15, 2024). The State filed a response in opposition to the appeal.

¶ 19                                II. ANALYSIS

¶ 20    Article 110 of the Code, as amended, abolished traditional monetary bail in favor of pretrial release on personal recognizance or with conditions of release. 725 ILCS 5/110-1.5, 110-2(a) (West 2024). In Illinois, all persons charged with an offense are eligible for pretrial release irrespective of the seriousness or the nature of the offense. *Id.* §§ 110-2(a), 110-6.1(e); *People v. Grayson*, 2024 IL App (4th) 241100-U, ¶ 7. To detain a defendant, the State has the burden to prove by clear and convincing evidence that the proof is evident or the presumption great that the defendant has committed a detainable offense (725 ILCS 5/110-6.1(e)(1) (West 2024)), that the defendant's pretrial release poses a real and present threat to the safety of any person or persons or the community based on the specific articulable facts of the case (*id.* §§ 110-6.1(a)(1)-(7), (e)(2)) or a high likelihood of willful flight to avoid prosecution (*id.* §§ 110-6.1(a)(8), (e)(3)), and that no condition or combination of conditions can mitigate the real and present threat to the safety of any person or the community or the risk of the defendant's willful flight (*id.* §110-6.1(e)(3)). "Evidence is clear and convincing if it leaves no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question." *Chaudhary v. Department of Human Services*, 2023 IL 127712, ¶ 74. The Code further requires that "[d]ecisions regarding release, conditions of

release, and detention prior to trial must be individualized, and no single factor or standard may be used exclusively to order detention." 725 ILCS 5/110-6.1(f)(7) (West 2024).

¶ 21    In this case, no live testimony was presented. The parties proceeded solely by proffer. Accordingly, we review *de novo* the trial court's factual findings and its detention orders. *People v. Morgan*, 2025 IL 130626, ¶ 54.

¶ 22    In his motion for relief, defendant raised three issues. Defendant argued that the State did not meet its burden to prove by clear and convincing evidence that (1) the proof is evident or the presumption great that he committed the offenses charged; (2) he posed a real and present threat to the safety of any person or the community; and (3) no conditions could mitigate any alleged threat.

¶ 23    Defendant argued first that the evidence did not establish that he committed the charged offenses because the police synopses upon which the State relied are based on the lower probable cause standard and, thus, insufficient for the State to meet its burden here to show, by clear and convincing evidence, that the proof is evident and presumption great that he committed the offenses.

¶ 24    We reject defendant's argument and agree with the trial court that the State met its burden. At a pretrial detention hearing, the State is explicitly permitted to present evidence "by way of proffer based upon reliable information." 725 ILCS 5/110-6.1(f)(2) (West 2024); see *id.* § 110-6.1(f)(5) (exempting detention hearings from the rules of evidence). Further, a police synopsis alone is sufficient to sustain the State's burden. *People v. Horne*, 2023 IL App (2d) 230382, ¶ 24. The synopsis here contained ample evidence to show that the proof was evident and presumption great that defendant committed a detainable offense. The synopsis related that Anderson stated that defendant engaged in an unprovoked fight with him, followed him in his vehicle, and fired a

shot at him. Fired shell casings were found in the area where Anderson alleged defendant fired at him and two live rounds were found in defendant's car and matched the casings found on the scene. Security footage corroborated the foregoing, Anderson identified defendant at a show up, and Brown stated he was a passenger in defendant's car and believed defendant shot a BB gun at Anderson.

¶ 25    Next, defendant argued that the State did not establish that he posed a real and present threat to the safety of any person or the community. Specifically, he asserted that the court erroneously relied on the police synopses and argued that the pending obstruction charge was a misdemeanor nonviolent charge.

¶ 26    Under the Code, factors that the trial court may consider in making a determination of dangerousness, *i.e.*, that a defendant poses a real and present threat to any person or the community, include, but are not limited to: (1) the nature and circumstances of any offense charged, including whether the offense is a crime of violence, involving a weapon, or a sex offense; (2) the history and characteristics of the defendant, including whether he or she has a prior criminal history indicative of violent, abusive, or assaultive behavior; (3) the identity of any person to whom the defendant is believed to pose a threat and the nature of the threat; (4) any statements made by or attributed to the defendant, together with the circumstances surrounding the statements; (5) the age and physical condition of the defendant; (6) the age and physical condition of the victim or complaining witness; (7) whether the defendant is known to possess or have access to any weapons; (8) whether, at the time of the current offense or any other offense, the defendant was on probation, parole, or any other form of supervised release from custody; and (9) any other factors, including those in section 110-5 of the Code (725 ILCS 5/110-5 (West 2024)), the court

deems to have a reasonable bearing on the defendant's propensity or reputation for violent, abusive, or assaultive behavior, or lack of such behavior. 725 ILCS 5/110-6.1(g) (West 2024).

¶ 27    We reject defendant's argument that the trial court erred in assessing dangerousness. In granting the State's petition to detain, the trial court noted that it was relying on the following statutory factors: the nature and circumstances of any charged offense, the history and characteristics of the defendant, including his prior criminal history indicative of violent, abusive, or assaultive behavior, or the lack of such behavior, the identity of any person to whom the defendant poses a threat and the nature of that threat, and whether the defendant is known to possess or have access to any weapons. The court also relied on the fact that defendant was on probation. The court's ruling was not erroneous. At the time of the incident here, defendant was a convicted felon and not allowed to possess a gun and he was on probation after pleading guilty to aggravated discharge of a firearm. Further, the present charges stemmed from Anderson asking a routine question, in response to which defendant allegedly engaged in a physical fight with him, flashed a firearm, and then followed and fired at him from his vehicle. Finally, defendant's criminal history includes the same offense—aggravated discharge of a firearm—under similar circumstances, showing defendant's dangerousness, where he is easily provoked to fire his weapon at others.

¶ 28    Defendant's final argument is that the court erred in finding that no conditions or combination thereof could mitigate any risk he posed. He contends that he could have been placed on EHM, ordered to check in with pretrial services more often, and that a no-contact order could have been put in place.

¶ 29    In determining which conditions of pretrial release, if any, will ensure the safety of any person or the community, the trial court may consider: (1) the nature and circumstances of the

offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; (4) the nature and seriousness of the real and present threat that would be posed by the defendant's release; and (5) the nature and seriousness of the risk of obstructing or attempting to obstruct the criminal justice process that would be posed by the defendant's release. 725 ILCS 5/110-5(a)(1)-(5) (West 2024). The history and characteristics of the defendant include his or her "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past relating to drug or alcohol abuse, conduct, *** criminal history, and record concerning appearance at court proceedings" as well as "whether, at the time of the current offense or arrest, [he or she] was on probation, parole, or on other release pending trial, sentencing, appeal, or completion of sentence for any offense under federal law, or the law of this or any other state." *Id.* § 110-5(a)(3)(A)-(B).

¶ 30 We agree with the trial court's assessment that no conditions could mitigate the threat defendant poses. Defendant's criminal history includes another charge for aggravated discharge of a firearm. While on probation for that offense, defendant was charged in this case. These circumstances reflect that no conditions would mitigate the threat he poses, as he has twice committed the same violent offense (and under similar circumstances) and further shows that defendant would not abide by any conditions ,where he was on probation for the first offense when he allegedly committed the acts leading to the present charges. Further, he possessed a weapon when he was not eligible to do so, which also shows that he will not follow the law. EHM permits a defendant several days to move about in the community. 730 ILCS 5/5-8A-4 (West 2024) (defendants on EHM must be provided a minimum of two days of "movement" to "participate in basic activities" such as those provided). However, EHM would not limit defendant's interaction

with the community to the extent that it could reasonably mitigate his propensity to be easily provoked to endanger others. The court's determination that no conditions could mitigate the threat defendant poses was not erroneous.

¶ 31                                III. CONCLUSION

¶ 32    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 33    Affirmed.